UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT DURST,<br><br>    Petitioner,<br><br>v.<br><br>RONALD RACKLEY,<br><br>    Respondent. | No. 2:15-cv-0306 KJM DB P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges his conviction following a jury trial in the Sacramento Superior Court in 2012, which resulted in a sentence of seventeen years. Petitioner alleges his conviction should be overturned pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). For the reasons set forth below, this Court will recommend the petition be denied.

## BACKGROUND

**I.    Facts Established at Trial**

The California Court of Appeal for the Third Appellate District provided the following factual summary:

> Defendant lived in a house in Sacramento with his wife and his wife's two daughters. Next door was a rental house belonging to Christopher Liu. Defendant did not like Liu because of a dispute over

1

payment for work defendant did for Liu on the rental. Defendant threatened that there would be consequences if Liu did not pay what defendant believed Liu owed him.

Late on the night of July 4, 2010, defendant was seen sitting on his front porch smoking a cigarette and drinking beer. He was again seen sitting on his front porch in the early morning hours of July 5, 2010. A strong smell of gas was emanating from Liu's rental property, which was empty at the time. The gas meter was spinning rapidly. A neighbor mentioned the smell to defendant, who said that he would look into it. The neighbor also saw a glowing light through the window in the rental house.

Later in the morning, workers arrived to do some work on the rental house. They also smelled gas and noticed the gas meter spinning rapidly. A leasing agent arrived at the property, made the same observations, and called 911.

Firefighters arrived and turned off the gas. When they forced open the front door to ventilate the house, the house exploded. Three firefighters were severely injured in the blast, while another sustained less serious injuries.

A candle with candy sprinkles in it, which had been in defendant's house, was found in the rental house and was identified as the source of ignition. Defendant's stepdaughter and her friend had put candy sprinkles in some candles. The gas valve for the stove in the rental house had been left open.

Two weeks after the explosion, defendant was interviewed by detectives. He admitted that he had stolen items from the rental house, including copper, a water heater, and a ceiling fan. After several hours of questioning, defendant admitted that he took the candle to the rental house, lit it, opened the gas valve for the stove, and left the house. Defendant was allowed to leave the police station in a taxi, but shortly after that he was arrested and booked.

The next day, at the jail, defendant again admitted his role in the house explosion.

A jury convicted defendant of arson causing great bodily injury (Pen.Code, § 451, subd. (a)), possession of a firearm by a convicted felon (Pen.Code, former § 12021, subd. (a)(1)), two counts of second degree burglary (Pen.Code, § 459), and two counts of receiving stolen property (Pen.Code, § 496). The jury also found true allegations appended to the arson count that defendant caused great bodily injury to a firefighter (Pen.Code, § 451.1, subd. (a)(2)), caused great bodily injury to more than one person (Pen.Code, § 451.1, subd. (a)(3)), and used a device to accelerate the fire or delay ignition (Pen.Code, § 451.1, subd. (a)(5)).

The trial court sentenced defendant to an aggregate determinate term of 17 years in state prison.

People v. Durst, Case No. C071233, 225 Cal. App. 4th 108, 170 Cal. Rptr. 3d 77, 80–81 (Mar. 28, 2014). (LD 17; Resp.'s Answer, Ex. A.)

## II. Procedural Background

Petitioner filed an appeal alleging that his confession to law enforcement was inadmissible pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). (Lodged Doc. ("LD") 14.) This claim was rejected in a reasoned opinion by the California Court of Appeal, Third Appellate District, on March 28, 2014. (LD 17.) Petitioner then appealed to the California Supreme Court, which summarily denied his petition for review on June 25, 2014. (LD 18-19.)

Petitioner does not appear to have sought habeas corpus review in the state courts. He filed his habeas corpus petition here on February 5, 2015. (ECF No. 1.) Respondent filed an answer (ECF No. 14) and petitioner filed a traverse (ECF No. 18).

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision.

3

Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. at 1451. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06). "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (Internal citations and quotation marks omitted.)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

4

Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

There are two ways a petitioner may satisfy subsection (d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient and the state court opinion may not be entitled to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

The second test, whether the state court's fact-finding process is insufficient, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error,

we must decide the habeas petition by considering de novo the constitutional issues raised."). For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

## ANALYSIS

Petitioner argues that his confession was inadmissible pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and that the trial court erred in denying his motion to suppress.

////

**I.    State Court Opinion**

Because the California Supreme Court denied review, the opinion of the California Court of Appeal is the last reasoned decision of the state court. It denied petitioner's <u>Miranda</u> claim as follows:

> *Voluntariness of Confession*
>
> At the preliminary hearing, defendant made a motion to suppress his confession made on July 20 at the jail. He argued that, even though the confession was made after he was advised of his Miranda rights, it was involuntary because that confession was caused by defendant's confession the day before, on July 19, in an interview during which he was not advised of his Miranda rights. According to defendant, the detectives who interviewed him engaged in a deliberate two-step process of (1) interviewing him before advising him of his *Miranda* rights so that they could get him to confess, then (2) arresting him and having him repeat the confession. The trial court, Judge Greta Curtis Fall presiding, denied the motion to suppress. Before trial, defendant renewed the motion, which was denied by Judge Marjorie Koller. Specifically, the court concluded defendant was not in custody during the July 19 interview and that the July 20 confession was voluntary. It therefore allowed the prosecution to introduce the July 20 confession to the jury. The defense decided to introduce the July 19 confession to try to establish that the confessions were false confessions.
>
> We conclude that, because defendant's opening brief fails to state the facts of the questioning in the light most favorable to the ruling, he forfeited the contention that the July 20 confession was involuntary. We also conclude that, even if the contention had not been forfeited, we would find there was no *Miranda* problem with the July 19 questioning because defendant was not in custody at the time.
>
> *A. Relevant Law*
>
> Under *Miranda*, "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' [Citation.] Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial. [Citations.] An officer's obligation to administer *Miranda* warnings attaches, however, 'only where there has been such a restriction on a person's freedom as to render him "in custody."' [Citations.] In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citation.]" (*Stansbury v. California* (1994) 511 U.S. 318, 322, 114 S. Ct. 1526, 1528–1529, 128 L. Ed.2d 293, 298.)

"...*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' [Citation.]" (*People v. Moore* (2011) 51 Cal. 4th 386, 402, 121 Cal. Rptr. 3d 280, 247 P.3d 515, italics omitted.) Also, using a ruse to elicit information has nothing to do with whether defendant was in custody for purposes of the Miranda rule. (*California v. Beheler* (1983) 463 U.S. 1121, 1123–1125, 103 S.Ct. 3517, 3519–3521, 77 L.Ed.2d 1275, 1278–1279; *Oregon v. Mathiason* (1977) 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L.Ed.2d 714, 719.)

Citing *Missouri v. Seibert* (2004) 542 U.S. 600, 124 S. Ct. 2601, 159 L.Ed.2d 643 (*Seibert*), defendant contends that the detectives who questioned him engaged in a practice that rendered involuntary his confession on July 20. In *Seibert*, Patrice Seibert's 12–year–old son Jonathan died in his sleep. In an attempt to avoid problems, she and her two teenage sons decided to burn the family's mobilehome and incinerate Jonathan's body in the process. They also planned to leave Donald, a mentally ill teenager who lived with the family in the mobilehome, with Jonathan to avoid any appearance that Jonathan had been unattended. One of Seibert's sons set the fire and Donald died. (*Seibert*, supra, 542 U.S. at p. 604, 124 S.Ct. 2601.) Five days later, the police arrived at 3:00 a.m. at the hospital where one of Seibert's teenage sons was being treated for burns and arrested Seibert. They took Seibert to the police station, interrogated her for 30 to 40 minutes, and accused her of planning to kill Donald in the process of burning her home, all without giving her *Miranda* warnings. (*Seibert*, *supra*, 542 U.S. at pp. 604–605, 124 S.Ct. 2601.) When Seibert admitted intending for Donald to die in the fire, the police gave her a 20–minute coffee and cigarette break, administered *Miranda* warnings, and got her to repeat the admission that she knew Donald was supposed to die in his sleep during the fire. (*Seibert*, *supra*, 542 U.S. at p. 605, 124 S.Ct. 2601.) The interrogating officer said he "made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" (*Id.* at pp. 605–606, 124 S. Ct. 2601.)

The *Seibert* court addressed "police protocol for custodial interrogation." (*Seibert*, *supra*, 542 U.S. at p. 604, 124 S. Ct. 2601.) And the court condemned what it called a two-step interrogation technique. (*Ibid*.) On this issue, the court concluded, "this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement," and it held "a statement repeated after a warning in such circumstances is inadmissible." (*Ibid.*) The court noted that custodial interrogations of this nature "reveal a police strategy adapted to undermine the *Miranda* warnings." (*Seibert*, *supra*, 542 U.S. at p. 616, 124 S. Ct. 2601, fn. omitted.)

*B. Circumstances of Interrogation*

Defendant does not challenge the factual findings made by the trial court in the suppression hearing. In fact, on appeal, he claims he

8

"arguably raises a pure question of law.... [Citation.]" Because defendant does not challenge the trial court's factual findings with respect to the suppression motion ruling, we recount the circumstances of the interrogation consistent with those factual findings and in the light most favorable to the ruling.

On July 19, 2010, about two weeks after the explosion, defendant agreed to go to the police station with his wife and two stepdaughters to be interviewed about the circumstances of the explosion. Defendant drove to the police station.

At the police station, Detective Greg Halstead and Detective Thomas Higgins interviewed defendant. The interview on July 19 took place in three stages: first the detectives interviewed defendant; second a polygraph examiner interviewed defendant and administered a polygraph test; and, third, the detectives again interviewed defendant. Defendant arrived at the police station around 4:30 p.m., and he left after 1:00 a.m. There were long breaks during the questioning.

During the first part of the interview, the detectives questioned defendant concerning the circumstances of the explosion, and he denied having anything to do with it. They told defendant that they knew that the candle came from his house and that they did not believe his denials. The detectives suggested that defendant may not have intended to blow up the house, and they discussed different punishments based on intent. They falsely told him that they had found his DNA on the gas valve. The detectives asked defendant to take a polygraph test, and he agreed.

During the polygraph test, defendant denied causing the explosion, but the polygraph examiner told him that the test was "negative." Defendant continued to deny involvement. After the polygraph examiner continued to suggest that defendant was involved and could not remember because he was drunk, defendant responded that he knew he did it because the polygraph test said he did and his DNA was found in the house, even though he did not remember.

Because defendant's wife had taken the car home, the detectives eventually returned and questioned defendant again. Defendant said he must have caused the explosion because the polygraph test said he did and his DNA was in the house. However, defendant finally stated that he entered the house, lit the candle, turned on the gas, and left.

Defendant left the police station in a taxi, but he was arrested before he got home and booked at the jail around 1:30 a.m. About nine and a half hours later, on July 20, the detectives met with defendant at the jail, advised him of his *Miranda* rights, and took his statement. He again admitted causing the explosion.

During the entire July 19 interview (which lasted past midnight), the doors to the interview rooms were not locked, and the detectives and polygraph examiner repeatedly told and assured defendant that he was free to leave. For example, when defendant claimed the

9

detectives would not let him leave unless he took the polygraph test, the polygraph examiner was emphatic that he was free to leave. Late in the July 19 interview, defendant was asked why he did not leave, and he responded that he had nothing to hide. He affirmed that he had not been tricked or intimidated.

*C. Forfeiture of Argument*

In arguing in his opening brief that the statement should have been excluded, defendant disregards the trial court's crucial findings concerning the facts. Most importantly, defendant relies on a transcript of his statements that the trial court expressly found to be unreliable. This appellate strategy forfeits review of the issue.

Review of a trial court's ruling concerning the admissibility of a defendant's statement is a two-part analysis. "[W]e accept the trial court's factual findings, based on its resolution of factual disputes, its choices among conflicting inferences, and its evaluations of witness credibility, provided that these findings are supported by substantial evidence. [Citation.] But we determine independently, based on the undisputed facts and those properly found by the trial court, whether the challenged statements were legally obtained. [Citation.]" (*People v. Mayfield* (1997) 14 Cal. 4th 668, 733, 60 Cal. Rptr. 2d 1, 928 P.2d 485.)

When the appellate standard is substantial evidence review, as it is here with respect to the trial court's factual findings, the appellant bears the burden of showing that no substantial evidence supports the challenged factual findings. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal. 3d 875, 881, 92 Cal. Rptr. 162, 479 P.2d 362; *People v. Dougherty* (1982) 138 Cal. App. 3d 278, 282, 188 Cal. Rptr. 123.) Failure to set forth the evidence most favorable to the factual findings—or, as in this case, to acknowledge that the factual findings even exist, along with supporting evidence—results in forfeiture of the contention that substantial evidence does not support the factual findings. (*Foreman & Clark Corp. v. Fallon*, *supra*, at p. 881, 92 Cal. Rptr. 162, 479 P.2d 362.)

Defendant's contention that his statement should have been excluded begins with an assertion that is not true. He claims: "There is no question as to what happened here." Later, he asserts: "There is little question that the detectives here employed a deliberate two step interrogation technique designed to circumvent the requirements of *Miranda*." Contrary to this assertion that there is "no question" or "little question" concerning what happened with respect to defendant's statements, that is the major question resolved by the trial court. The court held that the police officers did not use a two-step interrogation technique to circumvent the requirements of *Miranda*, and it is defendant's burden to establish on appeal that the trial court's finding was in error.

In attempting to carry his burden, defendant cites to a transcript that the trial court found was unreliable, and he cites specifically some of the interview the trial court stated was not transcribed correctly. The court reviewed the transcripts of the interviews and listened to the

actual recordings, and the court told the parties: "[A]s I indicated to both counsel earlier, the transcripts are not accurate as to what is actually on the recording, in many places...."

Defendant claims that he asked the detectives during the July 19 interview why he could not go home. However, the trial court found that he did not ask that question. Instead, he asked what was taking so long. The transcript was wrong. The trial court noted that the detectives asked him why he did not just leave, and defendant responded that he had nothing to hide. The trial court inferred from this that, even late in the interview process, defendant was aware of his ability to terminate the interview at any time. Defendant does not mention these factual findings in his opening brief.

Defendant recounts statements he made to the polygraph examiner to the effect that if he did not take the polygraph test he could not go home and that he was being kept there against his will. However, defendant gives short shrift to the assurances of the polygraph examiner that he was free to leave and that he did not have to take the polygraph test. The trial court, on the other hand, noted that the polygraph examiner told defendant, emphatically and repeatedly, that he was free to go. Defendant does not mention this factual finding in his opening brief.

Citing his own testimony at the suppression hearing, defendant states in his opening brief that, "[w]hile he was told he was free to go, the door was always locked and he could never leave." The court found, however, that "[t]he doors were never locked." Defendant does not mention this factual finding in his opening brief.

Defendant claims in his opening brief that during the July 19 interview he could hear his stepdaughter screaming in the other room and that it "tore [him] apart." However, defendant lied about hearing his stepdaughter scream.

At the hearing on the suppression motion, defendant testified that he could hear his stepdaughter screaming in the other room three or four times, "[e]very time [the detectives] came in or left the room." He could also hear her when the doors were closed, and the screaming continued for up to two hours. Defendant testified that hearing his stepdaughter screaming caused him to say something he "would not normally say" and he said those things "[t]o get [his] [step]daughter out of the room." He also testified that he asked, "[W]hat's up with my daughter[?]" and, "[W]hy can't my family go[?]"

Defendant's wife testified at the suppression hearing that there was only one time her daughter screamed while defendant was being questioned. The daughter did not like being in confined spaces and, when the door shut, she screamed. An officer returned to the room and propped the door open.

The trial court made the following factual findings concerning the matter: "I will address [defendant's] comments today regarding the fact that he heard his [step]daughter yell in the other room or scream in the other room. [¶] His testimony was that he heard it three or four

11

times at different times. [¶] And [defendant's wife] indicated she remembers one time, not multiple times. [¶] But throughout all of the tapes—and I listened to all of them—there was never ever a mention by [defendant] to the detectives of what's going on with my daughters, never, not once."

So the trial court concluded that defendant's testimony about his stepdaughter's screaming and his making statements because of that screaming was not credible and was contradicted by other evidence. Defendant mentions these factual findings only briefly in his opening brief, stating, "The court rejected the idea that [defendant's step]daughter was screaming during the interrogation...." As noted, however, defendant included this nonexistent circumstance in his factual summary of his opening brief.

The effect of defendant's appellate strategy is forfeiture, not persuasion. In support of his argument that his July 20 confession should have been excluded, defendant twists the facts in his favor and even cites nonexistent facts rather than stating the facts in the light most favorable to the ruling and rather than acknowledging and dealing with the trial court's factual findings. The strategy is flawed; his statement of facts relating to the confession is completely unreliable; and the outcome is that he forfeited review of the confession issues. (*Foreman & Clark Corp. v. Fallon*, *supra*, 3 Cal. 3d at p. 881, 92 Cal. Rptr. 162, 479 P.2d 362.)

*D. Analysis of the Merits*

Even if defendant had not forfeited review of whether his July 19 interview was custodial and his July 20 interview was the second part of a two-step interrogation technique prohibited by *Seibert*, we would conclude that the July 19 interview was not custodial and, therefore, *Seibert* was not implicated and the July 20 interview was not tainted.

"An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' (*Miranda v. Arizona*, *supra*, 384 U.S. at p. 444 [86 S. Ct. 1602].) Whether a person is in custody is an objective test; the pertinent inquiry is whether there was "'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" [Citation.]" (*People v. Leonard* (2007) 40 Cal. 4th 1370, 1400, 58 Cal. Rptr. 3d 368, 157 P.3d 973.)

When the evidence is viewed in the light most favorable to the ruling, it is evident that defendant was not in custody during the July 19 interview. Defendant was not formally arrested; the doors were not locked; and defendant was told repeatedly that he was free to leave. At the end of the long interview, he told the detectives that he stayed because he had nothing to hide. Under the objective standard cited above, defendant was not in custody.

People v. Durst, Case No. C071233, 225 Cal. App. 4th 108, 170 Cal. Rptr. 3d 77, 82–86 (Mar. 28, 2014).

12

**II.     Discussion**

Petitioner argues that the trial court erred in rejecting his motion to suppress his confession in violation of Miranda. In Miranda, supra, 384 U.S. at 479, the United States Supreme Court held that in order to protect an individual's privilege against self-incrimination during custodial interrogation, "the following measures are required. [The individual] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.... [U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." Id.

Central to petitioner's argument is the claim that the July 19 interview amounted to custodial interrogation. In support, petitioner relies on the following factors: (1) he was interviewed by the police at the police station; (2) although he was told he was free to leave, he told the police that "he knew he was not free to leave"; (3) the questioning took place over a nine-hour period; (4) two police officers and a polygraph examiner were present; and (5) the police repeatedly lied to petitioner.

Petitioner's identification of factors which might weigh in favor of an earlier finding of custody does little to avail him where, as here, other factors relied upon by the state court are more convincing. For example, it is undisputed that petitioner came to the police station of his own volition. See United States v. Kim, 292 F.3d 969, 974–975 (9th Cir. 2002) ("If the police ask—not order—someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter."). Additionally, petitioner was told repeatedly that he was free to leave, and both the Supreme Court and Ninth Circuit have repeatedly held that such statements strongly counsel against a finding of custody. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (declining to find custody where a suspect "came voluntarily to the police station, where he was immediately informed that he was not under arrest."); see also United States v. Bassignani, 575 F.3d 879, 886 (9th Cir. 2009) ("We

have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time.").

And although petitioner was questioned in a police station, there were no formal restraints on his movement in the interrogation room, and the trial court concluded that the door was not locked. See Mathiason, 429 U.S. at 495 ("[A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'"). Plaintiff himself acknowledged that he could have walked away but chose to stay for the entire nine-hour interview because he had nothing to hide. Indeed, at the end of the interview, petitioner left the police station in a cab. Finally, that the officers lied to him throughout the interview had "nothing to do with whether [petitioner] was in custody for purposes of the Miranda rule." Mathiason, 429 U.S. at 495-96.

Considering these factors, this Court concludes that a fairminded jurist could find under existing Supreme Court precedent that petitioner was not in custody on July 19 when he first confessed to the crime. Habeas relief is therefore foreclosed on that basis.

Having reached the merits of petitioner's claim, the Court finds it unnecessary to address respondent's alternate argument that the claim is procedurally barred and, relatedly, petitioner's claim that the state appellate court erred in concluding that he forfeited his Miranda argument for failing to state the facts of the claim in the light most favorable to the lower court ruling.

**CONCLUSION**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within seven days after service of the objections. The parties

are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed. <u>See</u> Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated: March 29, 2019

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

/DLB7;
DB/Inbox/Substantive/durs0306.fr